All right, may I proceed? Good morning, Your Honors. May it please the Court? My name is Melissa Thorm, and I'm here today representing the petitioner, which is the Southern California Alliance of Publicly Owned Treatment Works, or SCAP for short, because it's a very long name. I would like to request five minutes for rebuttal, please. Okay, what's your clock? SCAP is a trade association that represents cities and sanitation districts that serve the important public service of treating millions of gallons of wastewater every day, and that water is used to supplement water bodies in Southern California that otherwise would be dry much of the year, except during rain events, and also recharge groundwater. The issue before the Court today is a September 4, 2014, formal objection by the EPA that forced the changing of terms and two draft permits for SCAP members to add new effluent limitations for chronic toxicity that were both numeric and daily in form, which are inconsistent with the requirements of EPA regulations. So to give you a little background on toxicity, there are two forms of toxicity. One is acute toxicity, which means something is short-term, deadly, kills little critters that are part of the test. Chronic toxicity is a long-term test, four to nine days, that you subject the little critters to various levels of effluent in the water, and a control, which is essentially clean water, and you determine whether they grow or reproduce at levels that you're expecting them. It's not a chemical test, it's a biological test, and as you know, little critters can have different effects based on how their bodies are set up. Just like if someone drinks four glasses of tequila, it might not have any effect on one person and somebody else might be under the table. So these are biological critters, and things can register as toxic, even though it has nothing to do with toxicity. One example would be if the temperature was off in the laboratory, it could cause them to not grow or reproduce as quickly, or if something is irritating them, like I've heard stories of the lab creatures being on a shelf next to a door, and every time the door slams, it makes them upset and they don't grow or reproduce as much, but it doesn't have anything to do with toxicity. So there has been challenges to toxicity tests in the past. The Edison Electric Company, which was cited in our briefs, was one of those cases that challenged the 2002 regulations that regulated toxicity, and the court in that case warned against having a single sample be something that you could enforce against. So in this case, you have a daily maximum limit that is a single sample that would be enforceable. So a little bit on the permit history here. In 2002, there were permits that were issued by the Los Angeles Regional Board that included chronic toxicity limits that were both numeric and daily. Those were challenged to the state. The state board issued a decision in 2003 that invalidated those limits and sent them back to the regional board, and the state board's decision is in PER 0793 of the record. And in that case, they said that they were going to adopt chronic toxicity policy that would deal with these issues eventually, but at this point, a narrative effluent limit for toxicity that said no chronic toxicity in the effluent would be the effluent limit that would be required in all permits throughout the state. And there have been various permit appeals where permits did not have that in it, and it has been put in subsequently. So there is an effluent limit. EPA didn't like that it was in a section of the draft permit that talked about toxicity triggers, but there was an effluent limit in that toxicity triggers. The 2003 permits were reissued in accordance with the state board order. EPA did not veto those permits, did not challenge those permits at all. In 2007, on separate permits, EPA sent a letter, which is at PER 0781, that said that's fine to have a narrative limit, but you just have to make sure that certain other aspects are covered, and that was covered in the state board's order. In 2009, permits for these two treatment plants, Whittier Narrows and Pomona, were issued.  So the first time that we heard from EPA was 11 years later in 2014 when draft permits were issued by the regional water board that were consistent with the state board's order. And state board orders are precedential. They're binding upon the regional water boards to issue permits consistent with state board orders. And EPA objected to those permits, saying that they were inconsistent with federal rules. But the federal rules that they cite, they are reading words into those rules that don't exist. For example, they're saying you have to have a numeric effluent limit when the section that they're citing to does not require a numeric limit, and there's been several cases that we cited in our briefs, including the CBE case, that ruled that there is no requirement for a numeric limitation. They also cite to the fact that it needs to have a daily limitation, which is not required. Did you raise these objections to the regional board? Yes. Did the regional board accept your objections? No. And why isn't that now the decision of the regional board? This came up in the Crown-Simpson case, the exact same fact pattern where a regional board permit was objected to by EPA. And the Supreme Court said you don't need this seemingly irrational bifurcated review between the two, that your real question is the objection. That was what started the case. Right. That was before the law was amended. But the regional board had the discretion to accept or to reject what EPA said. And if EPA thought, after listening to your objections, that you were correct, then it could go back to EPA and say, we disagree with you. They might have had some further exchange of views on that, or the board might, the regional board might simply have said, we think you've read your regulations wrong, and we don't think that's what it requires us to do, and we decline to do it. Then you wouldn't be here. But once the board, once the board, the regional board acquiesced in that, it becomes the decision of the regional board. And you have a remedy within state law. We don't have a remedy within state law. Because if we went to state court, the state court could say, well, EPA has ruled on this. These are EPA's regulations, and we're going to defer to EPA. They might. Do they have to do that? They don't have to do that. Well, then why don't you have a remedy? If the state courts and the state administrative bodies can read these regulations as easily as we can, why isn't this their responsibility rather than ours at this point? Well, I do believe that Crown Simpson is still binding in good law. Even though law was amended after Crown Simpson? Law was amended to prevent a stalemate situation. So what happened before? The law was amended to allow EPA to come in if the state board declined to accept EPA standards and assume responsibility for it itself. Once EPA assumes responsibility for itself, then you can appeal EPA's decision to this court. But as long as the state board is adopting the final decision, it's the state's decision, not EPA's decision. EPA simply told the board what it thought the law was. The state board had the discretion to reject it or accept it. But under the SACA case, the United States Supreme Court, they said the remedy for the action of one agency is not an adequate remedy for another agency. So the regional board was ready to adopt the permits that it had proposed. The only reason why they were changed was because of EPA. The regional board was. . . Maybe they thought EPA was correct. They've been told before that. . . Who's they? The regional board had been told before in state court that daily maximum limitations are not correct and didn't appeal. . . Then it sounds like it will get reversed in the state administrative proceedings. Well, but the initial arbiter of federal law should be the federal courts. They're the ones that regulate what happens in federal agencies and have the first instance. Sure. Once you have a final decision from EPA, that's not a letter. It's got to be an order of some kind. Not when it's a promulgation of an effluent limitation. That was one of, in the Iowa League of Cities case, they overturned letters that were sent to Congress that promulgated effluent limitations for both blending and mixing zones. And in that case, the court said they're promulgating an effluent limitation and telling through guidance, essentially, you have to follow this rule. And so in Iowa League of Cities, they invalidated those letters. Those letters are essentially the same as the objection letter that says this is the rule and you need to follow it. And every permit since these permits has followed those. But when the EPA sent the objection letter, the state had the choice of not following it, didn't it? It did, but then they would lose jurisdiction to EPA. So it's a Hobson's choice. You either get to keep your permit and control what's in the permit or you give it up to EPA. EPA also was mistaken in the need for these limitations. And so if you look at the water quality objective that you're trying to meet, the water quality objective says that it should be no chronic toxicity in ambient waters outside of a mixing zone. So that means after the water is discharged from the outfall, it can mix with other water, and you just have to make sure there's no chronic toxicity outside of that. In the findings by the regional board, they said there is no TMDL, and luckily you had a case about TMDLs right before this so you understand what those are. There is no TMDL. There's no impairment for chronic toxicity, so there's really no necessity. In fact, they took the acute toxicity limits out of this permit altogether. Because there is no chronic toxicity in the receiving water, there's really no necessity for a permit limit for chronic toxicity at all. And the fact that the narrative requires chronic toxicity to be met in the effluent before it reaches the ambient waters, that means it's much more stringent than the water quality standard. Plus the water quality standard itself says that effluent limits for specific toxicants can be established by the regional board to control toxicity identified under a toxicity identification evaluation. And that was the way these permits were set up. If you had a hit and you triggered toxicity, you would go to make sure that hit was real, number one, and if it's real, then you do a toxicity identification evaluation to figure out what is causing that toxicity, because you can't control it until you know what it is. So once you know what it is, say it's copper, for example, then you could give an effluent limit for copper. So the basin plan actually set it up the same way, and EPA is saying it's not stringent enough to meet the water quality standard. Well, that's the way the water quality standard set it up in the first place, and we challenged EPA's approval of that water quality standard back in 2002, and it was overturned for not saying how they were going to translate that narrative into a... Don't you have an appeal right now pending that's being held in abeyance before the state? At the state water board, yes. So you have this very issue on appeal to the state. But I've been practicing in front of the state boards for 25 years, and if EPA says they have to do something, they're going to do what EPA says. Why is your appeal in abeyance? Because we're waiting to get a ruling from the federal court. So you asked for the appeal to be in abeyance. Yes. I'm trying to understand your objection. I understand you wanted to come here and see if you can get us to run some interference for you. It's a little bit of a belt and suspenders approach. But I'm still not sure that I understand why the state administrative process is not adequate to address this question. Well, number one, there's no exhaustion requirement for this kind of a case, and we think it would be futile anyway because even if you wanted to... I'm sorry, I don't understand why the no exhaustion requirement has anything to do with anything. You presently have an appeal pending before the state. It's the state administrative board, right? Yes. And do you have an appeal right to a California court from there? Yes. Okay. So you have at least two more steps to go within the California system. Right. But we believe it would be futile because if the state board or the state court turned the permits back to what they were in the draft permits that we wanted, then EPA could just object. Right. And we'd be right back here. That's okay. But then at that point, it would be EPA's responsibility, not to the regional boards. Right now, the actor here is the regional board. They have responsibility. They're the ones who have issued the orders. But we're not challenging the permit here. We're challenging the objection here. So the only way we can challenge the objection as illegal guidance is to use... Right, but letters are not final orders. They are. They can be final agency action. In the Iowa League of Cities case, they said that is the final word. They are now saying this is the rule. It's an unpromulgated rule. It didn't go through notice and comment. They're changing what's in the federal regulations. The federal regulations say only monthly average and weekly average limits for POTWs. It's very clear. They're changing that rule. It says very clearly you have to have a limitation if you have reasonable potential to exceed a water quality standard. It doesn't say anywhere in there that it has to be numeric. So they are changing the rules. And where they change the rules, we have the ability to challenge EPA at the beginning. We're not challenging the permits here. We're challenging EPA's objection, which is unpromulgated guidance being used as a rule. Did you want to save five minutes? Yes. Thank you. Good morning, Your Honors. I'm Eileen McDonough from the Justice Department here on behalf of EPA. With me at council table is Marcella Von Volcano, who is with EPA's Office of Regional Counsel for Region 9. In the case before the court, the SCAP members at issue have permits. There are permits that had been issued by the state or the regional board after the EPA objection. There was a draft permit, an EPA objection. The state then went through notice and comment and chose to issue a final permit. The permittees are dissatisfied with the permit terms. They have a right to the administrative review, which they have stayed on the state level, and then they have the right to go to the California State Court to avenge these. What is the history of California administrative appeals and then court appeals second-guessing EPA? I can't answer that offhand, Your Honor. But I would note that this court has previously noted or stated in decisions that the federal, that the state courts are perfectly capable of applying federal law. Sure. So if a state court held that EPA had exceeded its authority in some way for whatever reason, what would be the next step? I'm sorry, Your Honor. Let's suppose that it went to the state administrative, the appeal board, and then went from there into the California court system. And at some level within California, let's call it the California Supreme Court. The California Supreme Court says, in our view, EPA has overstated its authority in one way or another. It didn't follow its own regulations. This was a new regulation. It did something contrary to the Clean Water Act, whatever. What does EPA do next? Does it have to take that to the U.S. Supreme Court? EPA would not have to do anything at that point. EPA would, I mean, I guess it would have had the option of participating before the state as an amicus, but they're not a party to the state proceeding. If the California state court came out with a decision that required different permit terms, then the state board would have to incorporate those terms into a new permit. EPA would have the discretionary option at that point to make a new objection, in which case, of course, the regional board could no longer accept the modification, and then EPA would take over the permit and go forward in its procedure. Is that the only scenario in which SCAP can challenge EPA's interpretation of the Clean Water Act and its regulations? No, we believe that SCAP is free to argue to the California authorities, including administrative and judicial, that EPA has misconstrued its rules. If SCAP thought that EPA had badly misconstrued its own regulations or that it was adopting standards that it had not promulgated pursuant to the Administrative Procedure Act, how do they get review of that in federal court? I don't believe they can get that in federal court unless the state system says EPA is wrong and EPA then issues the other objection and goes through its own procedures. Because at this point, neither the state nor SCAP requested a hearing on EPA's objection. So could SCAP have requested a hearing before the EPA on the objection at the time? Yes. The statute says the state can request a hearing. EPA's regulations expanded that right. Wait. I'm sorry. Did you say that the state could request a hearing? They could have, yes. What about SCAP? Under EPA's regulations, yes. So EPA could have requested a hearing before the EPA? Yes. So what regulation is that under which they could have? It is in my brief, and it's part of Section 124. So there's a CFR section that we could look at to verify that? Yes. Yes. See, the thing that's beginning to bother me, what I'm hearing, and I think possibly other people as well, is this notion that via objection the EPA could change rules and change regulations and sidestep the notice and comment requirements that usually accompany, you know, a rule change. That's sort of the suggestion that we're getting. Well, that is SCAP's suggestion. First, we disagree with it because we don't believe it is a new concept. The EPA rules, in effect, since I think the ---- Did you want us to weigh in on that question? On the question of whether the rules? Right. Whether EPA has correctly interpreted the Clean Water Act and its regulations. At this point, in this context, no. If EPA had taken over the permit, if the state had refused to modify it, and it had gone through EPA's permitting process, including the appeal to the Environmental Appeals Board, which this court has said is the final word on an EPA permit decision, then yes, this court would be the appropriate place for a final decision on whether EPA had properly attended its rules. What we have here is a state permit with issues or just with terms set by the state. They can raise these arguments to the state court. So if we thought ---- If SCAP argued that there was procedural error by EPA, that is that EPA had effectively promulgated new standards that it had never undertaken before, and it was obligated to follow notice and comment procedures, and it failed to do that. It simply issued a letter. So it had avoided all of the public comment, which would have allowed for appeal to an appropriate court of appeals and so forth. Their remedy at this point is still to argue even the procedural error, much less any substantive error in the California system. Yes, that is what we believe. What do we do with the Iowa League of Cities? Is that decision just wrong, or is it distinguishable? Well, we do believe that it's wrong, but we also believe it's distinguishable. In Iowa League of Cities, these were ---- They were reviewing regulations that ---- I'm sorry, letters that EPA had sent to a congressman explaining EPA's interpretation of a statute or regulations. The court in Iowa City said that was final, regardless of the vehicle that it was ensconced in. But this case is different because what we're dealing with here is a very specific statutory scheme created by Congress to balance the issues of the state and federal authorities over these permits. Congress intended that the states, once authorized, would be the driving force with the primary responsibility, but they gave EPA this discretionary right to issue an objection and potentially, depending on what the state did, take over the permit. By definition, under that statute, this is an interim step. When the objection comes out, nobody knows what's going to happen. What is the state going to do? What is going to happen on further state review? But you said at that point, SCAP can object to the objection to the EPA. At that point, they can request a hearing before the agency on whether after which the agency can either affirm, modify, or withdraw its objection. But we don't believe that that would then be appealable because, again, all that it culminates in is the objection. The objection itself is an interim step. Right, but so if the EPA objects to the state permit and SCAP comes in and challenges the requirements, the things that the agency wants the state to modify about its proposed permitting, what happens next? They have a hearing, and then what? Then EPA makes its decision whether it's going to continue to maintain the objection or not, and then the state, if EPA says yes, the state then makes a decision whether to modify the permit or to have EPA take responsibility and start its own permitting procedures. So basically what happens, once the objection comes out and is reaffirmed, the permit goes off on one of two tracks. Either it goes to the state, and this is decided by the state. Either it goes off on the state or to the federal. The check on the EPA in this case is the state. Yes. Only their interests may be so aligned at times that they don't really have an objection in California and the EPA. And that may be. Yeah. But, again, this is how Congress chose to structure the system. And my opposing counsel said that, in her experience, the state board would never refuse to go along with EPA. I think that is by far an overstatement. Certainly there's one case that we've cited, Champion International. It was not California. It was North Carolina. But they refused to modify the permit. You know, I can't guess what a state agency is going to do. No, I'm just trying to understand the procedure. We're not asking you to do that. Oh, sure. But, I mean, that's just the result of the way the statute was set up. And this Court, in the Schell case, noted that the Court should be very loath to think that there is a basis for federal authorities to be coercing states so that the state regulators aren't exercising their individual judgment as to what is required under these permits. And the term coercion, you know, here nothing happens to the state agency except that the permitting authority shifts. That makes it different from some of the cases that have been cited to where the Fish and Wildlife Service issued a biological opinion, and if the other agencies did not follow that opinion, they were liable for enforcement. And that was deemed coercion because who wants to take on the risk of federal enforcements by other people? Now, here, there is no coercive authority against the state. They make a decision. Do we accept this permit or not? It's just a very odd, very cumbersome procedure that we're going to have to depend, in the example that I gave you, the hypothetical that I gave you a few minutes ago, that we would depend on the California Supreme Court to say EPA didn't follow the APA. That feels pretty awkward. I agree that it is awkward, but it's the consequence of Congress's decision to maintain a role for, that the states would have the main role, but EPA would have this objection authority. And it is to some extent cumbersome, but it's the result of how the statute was set up, and it also avoids the complexity of having this court be ruling on an interim step and then have a state court be ruling on a final step. And that can get complicated in many issues because, you know, here we're focusing on one particular point, but a permit involves a lot of terms. So they could wind up where a person is asking the federal court to address one term and then later coming back to the state court to argue a bunch of other terms that were not the subject of an EPA objection, but nonetheless are included in the permit. So you wind up with a complexity of overlapping jurisdictions there, and that's inconsistent with the court's decision in Boise Cascade, which is cited in the brief, where it says state courts should review state permits, federal courts should review federal permits. There are states that have not chosen to assume the authority to administer the NPDES program. There EPA issues the permits and they go up to federal court. But where here you have a state that has decided to take the authority for administering this program, the state is the dominant actor, and EPA has one narrow discretionary function in addition to their general oversight. They sit down and meet with the state periodically to do a general permit review. And actually as noted in the objection letter itself, EPA has been raising this very issue with the state board in its 2008 review and in the draft 2014 review. So it's not a new issue. It's been bubbling for a while between the two agencies. And at this point EPA determined in its discretion to raise the objection. The state board in its discretion decided to modify the permit. And now the state authorities, once the stay is lifted, if it expires in 2017, will go ahead and decide whether or not the permit terms are acceptable under both federal and state law. Because there is also the side issue that state law may exceed federal law. And a condition that may not survive under federal law may survive under state law. I don't know if that would be here, but that's certainly a possibility in some cases. So that's our main point is that there's a state permit, an argument over the terms of the state permit, and the state authorities have full capability to sort that out at the end of the day. With respect to the actual permit terms, if the court should reach those, we believe EPA's decision is explained thoroughly in the objection letter as to why the particular permit terms in the draft permits were not adequate. First, everyone agrees that there has to be an effluent limitation because the discharge from these plants have the reasonable potential to cause exceedance of the water quality standard that's in effect. The debate over whether there is a need for a numeric limit is not been presented accurately. The EPA regulations say there should be a numeric limit unless it's infeasible. And there is an argument then EPA says infeasible to calculate, petitioners say that it may be infeasible to implement, but in either case there hasn't been any evidence produced in the record to show that it would be infeasible under either standard. There are other plants in California and in other states that function with numeric limits and there's no showing that such limits would be infeasible here regardless of how you apply that standard. It's also, this is not a new concept. I would point you back to the decision from 2012 that petitioners say is presidential here from the state water board. And in that very decision they said numeric effluent limitations are generally preferred. NPDES permits can legally contain best management practices in lieu of numeric limitations where the permitting authority determines that numeric effluent limitations are, quote, not feasible. So this is not a new promulgation. This is what has always been. Then I do have a few more minutes so I would like to swing back to the specific jurisdictional questions, both the constitutional and the statutory. The constitutional, we believe there is no standing because the injury to the extent there is one was inflicted by the state board's decision. We believe it cannot be remedied by this court because this court does not have the authority to order the state to change its permitting decision. At most this would be, I mean, it would obviously be persuasive to the state, but it could not be a legally compelling requirement that it be changed. So we don't believe that there is standing to go forward. We don't believe that there is a statutory basis for the claim either. The claim under 1F, which permits the court to review the grant or decision under the denial of a permit, the Crown-Simpson holding was changed by the 1977 amendment, and that's been explained in detail in both the American Paper Institute decision out of the Seventh Circuit and the championship decision out of, I believe it was the Fourth Circuit, but that's cited here. And they did a careful parsing of the legislative history to show that this was to effectively undo the Crown-Simpson holding so that an EPA objection would not deny a permit, but would simply at most send it off to a different permitting process. And with respect to the subpart E argument, we believe that that was resolved by this court in the portion of Crown-Simpson that was not  And we believe that it should be left for the State court because it's the application of a regulation to a specific permit. All right. Thank you, counsel. Thank you. Your time is up. Thank you. Ms. Dorn, you have time left. Thank you, Your Honors. I just wanted to hit on some of the issues that came up. One was about requesting a public hearing. In California, we have a memorandum of understanding between the State water boards and EPA. And in that memorandum of understanding, it says only the State water board or the regional water boards can request a hearing. So it's different from the federal rule. My understanding is that when you have a State-specific memorandum agreement that that controls, and that agreement is at PER 0956, if you wanted to take a look at that. One of the biggest questions I have is why was this objection on the record now? Eleven years after the rules had changed in California about how chronic toxicity should be regulated, there's been 11 years of permits throughout the State that had the same exact layout of the draft permits. They had a trigger. So if you hit a numeric trigger, that you would do more testing. It has a toxicity reduction evaluation to figure out if you can reduce the things causing toxicity. There's extensive monitoring requirements. There's also a receiving water objective that says that the receiving water can't have chronic toxicity in it. And there's a reopener in the permit to allow the water board, if you figured out what the toxic pollutant was that was causing toxicity, to come back into play. So water quality is being protected, even with the draft permit. So it was really unclear why EPA was making this objection. Their objection letter talked about short-term acute toxicity issues, and that was why they were objecting. But as I told you in the beginning, this is chronic toxicity. It's long-term exposure to something that is not an acute toxicity problem. So the state board order was what the regional board was following to try to have a permit that was valid. EPA's objection modified that entire process. And Crown-Simpson, for the 509B1F prong of jurisdiction, the Four Laws case in the Ninth Circuit in 1983 still talked about the problem of bifurcated review. So the Ninth Circuit has wrestled with this issue after 1977 and after the Crown-Simpson case was adopted in 1980. So it's either the functional equivalent of a denial, and EPA, in a brief as recently as 2007, was citing to Crown-Simpson. So in footnote 3 of our reply, we did raise the issue of judicial estoppel. They should not be able to raise that separately. Then there's the separate authority under 509B1E, which is where they promulgate a new effluent limit. As I walked you through, it's very clear what the regulations say as to what limits are required. And if EPA is promulgating something different, they should go through a notice and comment public review process. If they want to make things numeric, they want to make POTWs have daily max limits, that's not what the rules say right now. That's fine if they want to go through a public comment period and adopt those rules, but that shouldn't be done in a letter objecting to a permit, which is now the law of the land in this region, and all the permits are being adopted the same way. So there's no real way to get at it without getting at the objection itself. Thank you very much. Thank you very much, counsel. SCAP versus the EPA will be submitted.
judges: Wardlaw, Bybee, Bell